**Jane ROE, Mary Moe and Annyce Hawkins, Individually and on behalf of all others similarly situated, John Franklin, M.D., and Louis Gerstley, III, M.D., Individually and on behalf of all others similarly situated, Planned Parenthood of Southeastern Pennsylvania, Elizabeth Blackwell Health Center for Women, Women's Health Services and Philadelphia Welfare Rights Organization, Pennsylvania not-for-profit corporations**

v.

**Robert E. CASEY, Individually and in his official capacity as Treasurer of the Commonwealth of Pennsylvania, and Aldo Colautti, Individually and in his official capacity as Secretary of the Department of Public Welfare of the Commonwealth of Pennsylvania.**

Civ. A. No. 78–2214.

United States District Court,
E. D. Pennsylvania.

Dec. 21, 1978.

Alice M. Price, Women's Law Project, Roland Morris, Paulette Ettachild, Community Legal Services, Thomas B. Harvey, American Civil Liberties Union of Pa., Philadelphia, Pa., for plaintiffs.

Louis G. F. Retacco, Chief Counsel to the State Treasurer, Harrisburg, Pa., Maria Parisi Vickers, Asst. Atty. Gen., Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

The narrow issue presented by this action for final injunctive and declaratory relief is whether recent enactments of the Pennsylvania legislature, which preclude medical assistance payments for abortions, other than those necessary to save the life of the mother, deprive the plaintiffs of their rights under Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.* ("Social Security Act," "Medicaid," or "Title XIX"), or the First, Fourth, Ninth and Fourteenth Amendments to the Constitution of the United States. For the reasons stated below, we hold that Pennsylvania's prohibitions upon Medicaid funding for abortions other than those necessary to save the life of the mother deprive the plaintiffs of their right to receive reimbursement, pursuant to Title XIX of the Social Security Act, for medically necessary procedures, including medically necessary abortions. Because we find the plaintiffs' constitutional claims to be sufficiently substantial to confer jurisdiction upon this Court, *see White v. Beal*, 555 F.2d 1146, 1149 (3d Cir. 1977), and because our holding with respect to the plaintiffs' federal statutory claim is dispositive of the action before us, we do not reach the constitutional issues raised by the plaintiffs' complaint.

The plaintiffs brought this action for injunctive and declaratory relief pursuant to Title XIX of the Social Security Act and pursuant to 42 U.S.C. § 1983 to redress the deprivation of the plaintiffs' constitutional rights to personal privacy, due process and equal protection, as guaranteed by the First, Fourth, Ninth and Fourteenth Amendments to the United States Constitution. The complaint seeks relief in the form of an Order of this Court, pursuant to 28 U.S.C. §§ 2201, 2202 and Federal Rules of Civil Procedure 57 and 65, declaring invalid and enjoining the enactment and implementation of Pennsylvania Public Acts 16A and 148, Pa. Act No. 1978–16A, May 31, 1978, P.L. ——, and Pa. Act No. 1978–148, September 26, 1978, P.L. ——, respectively, which prohibit state medical assistance payments for medically necessary abortions, other than those necessary to save the life of the mother, to women otherwise eligible to receive medical assistance pursuant to Title XIX of the Social Security Act. The named plaintiffs are Jane Roe ("Roe"), Mary Moe ("Moe"), Annyce Hawkins ("Hawkins"), John Franklin, M.D. ("Franklin"), Louis Gerstley, III, M.D. ("Gerstley"), Planned Parenthood of Southeastern Pennsylvania ("Planned Parenthood"), Elizabeth Blackwell Health Center for Women ("Elizabeth Blackwell"), Women's Health Services ("Women's Health") and Philadelphia Welfare Rights Organization ("Welfare Rights") (collectively, "health care providers").[1] Plaintiffs Roe,

---

1. Named as plaintiffs in the original complaint, filed June 30, 1978, were Roe and Colleen Boyle ("Boyle"), suing individually and on behalf of all others similarly situated; Franklin, Gerstley and Marvin Samuels, M.D. ("Samuels"); and, Planned Parenthood, Elizabeth Blackwell, Women's Health and Welfare Rights. In the amended complaint, filed July 7, 1978, Franklin, Gerstley and Samuels amended their status by asserting that they were suing individually

Moe and Hawkins are each eligible for and dependent upon medical assistance and have each been certified by a physician as needing a medically necessary, but not life-saving, abortion to preserve her health. Roe is a 23-year-old female who intended to carry her pregnancy to term but who suffers from a condition called hyperemsis gravidorum. As a result of this condition, which is complicated by pregnancy, she cannot digest food and suffers constant abdominal pain. Moe is a 13-year-old female who is pregnant and who has been certified by her physician as needing an abortion to preserve her health because her immature pelvis would cause difficult labor and probable internal damage, there would be an increased incidence of pre-eclampsia if she carried the pregnancy to term and her nutritional status would be adversely affected. Hawkins has a history of psychiatric problems and has been hospitalized because of an attempted suicide. Hawkins' psychiatrist has certified that her pregnancy has caused increased depression, that she is capable of carrying out her suicide threat and that an abortion is necessary for her health because an inability to secure an abortion would result in severe psychological damage. Roe, Moe and Hawkins bring this action on behalf of themselves and all others similarly situated. Plaintiffs Franklin and Gerstley, physicians licensed to practice medicine in the Commonwealth of Pennsylvania who specialize in the field of obstetrics and gynecology and who perform abortions for, and desire to continue performing abortions for, patients requiring them after private consultation and appropriate medical review, bring this action on behalf of themselves and all others similarly situated. Plaintiffs Planned Parenthood, Elizabeth Blackwell and Women's Health are Pennsylvania not-for-profit corporations which provide, inter alia, obstetrical and gynecological health care, including abortions which have been certified by a physician as being medically necessary, for Medicaid-eligible patients. Plaintiff Welfare Rights is

an unincorporated association with offices in Philadelphia which consists of, and is directed by, Medicaid and public assistance recipients, including those for whom abortions have been and potentially will be certified as being medically necessary. The named defendants are Robert E. Casey ("Casey"), who is sued individually and in his official capacity as Treasurer of the Commonwealth of Pennsylvania, and who is responsible for the release of Commonwealth funds to reimburse physicians and health care providers for the performance of abortion services, and Aldo Colautti ("Colautti"), who is sued individually and in his official capacity as Secretary of the Department of Public Welfare of the Commonwealth of Pennsylvania ("Public Welfare"), and who is responsible for the overall operation and administration of Public Welfare's programs and for the expenditure of sums appropriated for those programs, including medical assistance payments for abortions.

In Count I of their complaint, the plaintiffs allege that Public Acts 16A and 148, on their face and as applied, deny reimbursement to women patients eligible to receive medical assistance for medically necessary abortions and, as such, violate their rights under 42 U.S.C. §§ 1396a(a)(13), (17), (19) and (22)(D), 42 C.F.R. § 449.10(a)(5)(i) and other implementing federal regulations and have, therefore, violated their rights under the Supremacy Clause of the United States Constitution, Article 6, Clause 2. In Counts II and III, the named women plaintiffs allege that Public Acts 16A and 148, on their face and as applied, deprive them and the class they represent of their rights under the due process and equal protection clauses of the Fourteenth Amendment, and the rights retained by them under the Ninth Amendment, respectively, to the United States Constitution. In Count IV, the plaintiffs allege that Public Acts 16A and 148, on their face and as applied, deny plaintiffs Franklin, Gerstley, the class of

and on behalf of all others similarly situated. In the second amended complaint, filed July 18, 1978, Boyle and Samuels were dropped, and

Moe and Hawkins were added as named plaintiffs.

physicians, Planned Parenthood, Elizabeth Blackwell and Women's Rights reimbursement for necessary medical services rendered to their indigent women patients eligible for Medicaid, and interferes with their professional medical judgment as to the medically necessary and appropriate treatment of, and treatment in the best interests of, such patients and violates their rights under 42 U.S.C. § 1396, 42 C.F.R. § 449.-10(a)(3)(i) and other implementing federal regulations. In Counts V and VI, plaintiffs Franklin, Gerstley and the class of physicians claim that Public Acts 16A and 148, on their face and as applied, deprive them of rights guaranteed by the equal protection and due process clauses of the Fourteenth Amendment of their rights to provide, *inter alia*, appropriate and necessary medical treatment under the Ninth Amendment, respectively, to the United States Constitution. Lastly, in Count VII, Welfare Rights, by incorporation, asserts Counts I through VI on behalf of the class of women patients. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1343 and 1331, and the amount in controversy is alleged to exceed $10,000, exclusive of interest and costs.

The procedural history of and facts pertinent to this Opinion are as follows: Public Act 16A, otherwise known as H.B. 2246 or the Appropriations Act of 1978, is a general appropriations act which states, in pertinent part:

No money shall be disbursed from this appropriation [$395,540,000 to the Department of Welfare for Medical Assistance] to pay for, make reimbursement for, or otherwise to support the performance of any abortion except where the abortion is certified in writing by a physician to be necessary to save the life of the mother.

Public Act 16A, p. 38, lines 11–16. The Senate and House of Representatives of the Commonwealth of Pennsylvania signed Public Act 16A on May 23, 1978, and it was then transmitted to Milton J. Shapp, Governor of the Commonwealth of Pennsylvania ("Governor"). Pursuant to the Governor's request, the Office of the Attorney General of the Commonwealth of Pennsylvania ("Attorney General") issued an Opinion, dated May 31, 1978, which questioned the constitutionality of several provisions of Public Act 16A, including that language set out above, on the ground that the Pennsylvania Constitution did not permit substantive language to be included in an appropriations bill. On the basis of the Attorney General's Opinion, the Governor signed Public Act 16A on May 31, 1978, but line-vetoed several provisions of the bill, including that provision relating to the funding of abortions. On the same day, the Governor issued a press release stating that his Administration would ignore the substantive language contained in Public Act 16A. On June 13 and 14, 1978, respectively, the House of Representatives and the Senate of the Commonwealth of Pennsylvania overrode the Governor's line-vetoes, and Public Act 16A was slated to become effective July 1, 1978. On June 28, 1978, Casey issued a statement which declared that, beginning July 1, 1978, he would follow the mandate of Public Act 16A.

The plaintiffs filed their original complaint on June 30, 1978, requesting injunctive and declaratory relief with respect to Public Act 16A and, at the same time, also filed a motion for a temporary restraining order and preliminary injunction, pursuant to Fed.R.Civ.P. 65. By Order dated June 30, 1978, this Court granted plaintiffs' motion for a temporary restraining order and enjoined Casey from refusing to reimburse providers of medically necessary abortions performed upon Pennsylvania Medicaid recipients solely on the basis of Public Act 16A. On July 7, 1978, a hearing was held on plaintiffs' motion for a preliminary injunction. At that hearing, testimony was heard and stipulations were entered on the record concerning, *inter alia*, the defendants' positions with respect to the reimbursement from state funds for other than lifesaving abortions. In essence, Casey's position was that he would follow the provisions of Public Act 16A and Colautti's position was that he would follow the Governor's position with respect to the unconstitutionality of the substantive provisions in

Public Act 16A. The temporary restraining order was then ordered continued until the submission of briefs by the parties on August 28 and September 5, 1978, respectively, and the Court's decision on plaintiffs' motion for a preliminary injunction. On July 18, 1978, a Stipulation of Facts was filed with the Court and, by Order dated July 31, 1978, we granted plaintiffs' uncontested motion for determination of this suit as a class action and certified two subclasses pursuant to Fed.R.Civ.P. 23(a), (b)(2) and (c)(4)(B).[2] And, on September 25, 1978, we approved the agreement of all counsel that Colautti would maintain the *status quo* prior to July 1, 1978, with respect to reimbursement for Medicaid abortions, and dismissing the pending action, with prejudice and without costs, as to Colautti.

While the plaintiffs' motions for a preliminary injunction with respect to Public Act 16A were pending, the Pennsylvania legislature, on September 26, 1978, overrode Governor Shapp's veto and enacted into law Public Act 148, otherwise known as S.B. 1254, slated to become effective immediately, which states, in pertinent part:

> . . . no public funds shall be used to promote abortions, no abortions shall be subsidized by any State or local government agency . . . unless there is filed with such agency a certificate signed by a physician stating that the abortion is necessary in order to save the life of the mother. . . .

Public Act 148, Section 7, lines 16–20, 1–2. On September 28, 1978, plaintiffs filed motions for a temporary restraining order with respect to Public Act 148, for leave to file supplemental pleadings and to amend class certification, pursuant to Fed.R.Civ.P. 15(d) and 65, respectively. By Order dated September 28, 1978, after a hearing on the motion, this Court granted plaintiffs' motions for a temporary restraining order against Casey and Colautti with respect to the implementation of Public Act 148, granted plaintiffs' motion for leave to file supplemental pleadings to include in the original pleadings allegations pertaining to Public Act 148 and granted plaintiffs' motion to amend class certification, with the previously certified subclasses redefined to include allegations pertaining to Public Act 148. A hearing was then held, on October 5, 1978, on plaintiffs' motion for a preliminary injunction to enjoin the defendants from enforcing either Public Act 16A or Public Act 148. The motion for preliminary injunction was then taken under advisement and the parties were permitted to file supplemental briefs. After receipt of all supplemental briefs, this Court, by Order dated October 30, 1978, consolidated the plaintiffs' motion for a preliminary injunction with the Court's final determination of the merits of plaintiffs' request for final injunctive and declaratory relief. All parties were given 15 days from the date of the October 30 Order to submit supplemental briefs on the merits to the Court. The case is presently ripe for this Court's final determination on the merits.

Title XIX of the Social Security Act, commonly referred to as Medicaid, was enacted in 1965 for the purpose of "enabling each State, as far as practicable under the conditions in such State, to furnish," *inter*

---

**2.** The subclasses certified by this Court pursuant to Fed.R.Civ.P. 23(a), (b)(2) and (c)(4)(B) are as follows:

1. *Women-class*: Pregnant or potentially pregnant women who are eligible for medical assistance under the Pennsylvania Medical Assistance Program, 62 P.S. § 441.1 *et seq.*, for whom abortions are medically necessary as set forth in the regulations of the Pennsylvania Department of Public Welfare, Medical Assistance Manual § 9100, although not necessary to save their life, and who have been or will be prevented or impeded in obtaining therapeutic abortions because of Public Act 16A and Public Act 148.

2. *Doctor-class*: Duly licensed physicians in Pennsylvania who are entitled to obtain reimbursement for necessary medical services rendered to, and to perform medically necessary abortions for, persons eligible for medical services under the Pennsylvania Medical Assistance Program, 62 P.S. § 441.1 *et seq.*, and who would be denied reimbursement because of the enactment of Public Act 16A and Public Act 148.

The Court notes that the references to Public Act 148 in the description of the classes certified were added by this Court's Order of September 28, 1978.

*alia,* medical assistance on behalf of certain specified persons whose income and resources are insufficient to meet the costs of necessary medical services. 42 U.S.C. § 1396.[3] Medicaid is a program of "cooperative federalism" which is jointly funded by the federal government and the participating state. 42 U.S.C. § 1396a(a)(2). But while jointly financed, the Medicaid program is administered solely by the participating state, and the Department of Public Welfare of the Commonwealth of Pennsylvania is the state agency designated pursuant to § 1396a(a)(5) to administer Pennsylvania's Medicaid program. As a requirement of participating in Title XIX's program, Pennsylvania is required to administer its state plan in conformity with certain federal statutory requirements and implementing regulations. 42 U.S.C. §§ 1320c–13, 1396a. 42 U.S.C. § 1396a(a)(10)(A)[4] requires that a qualifying state Medicaid program must reimburse persons eligible to receive Medicaid under the federal categorical assistance program for certain medical services (the "categorically needy"). The medical services which must be provided to the categorically needy by the state are at least the first five of the sixteen types of services delineated in § 1396d(a),[5] which

**3.** 42 U.S.C. § 1396 states, in pertinent part:
*Authorization of appropriations*
For the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services . . . there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this subchapter. The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary of Health, Education, and Welfare, State plans for medical assistance.

**4.** 42 U.S.C. § 1396a(a)(10) states, in pertinent part, that a state plan for medical assistance must:
provide—
(A) for making medical assistance available to all individuals receiving aid or assistance under any plan of the State . . . ;
(B) that the medical assistance made available to any individual described in clause (A)—
(i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and
(ii) shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in clause A; and
(C) if medical assistance is included for any group of individuals who are not described in clause (A) and who do not meet the income and resources requirements of the appropriate State plan . . .—
(i) for making medical assistance available to all individuals who would, except for income and resources, be eligible for aid or assistance under any such State plan . . and who have insufficient . . . income and resources to meet the costs of necessary medical and remedial care and services, and

(ii) that the medical assistance made available to all individuals not described in clause (A) shall be equal in amount, duration, and scope . . . to any other individuals not described in clause (A) . . . .

**5.** 42 U.S.C. § 1396d states, in pertinent part:
(a) The term "medical assistance" means payment of part or all of the cost of the following care and services . . . for individuals, and, with respect to physicians' or dentists' services, at the option of the State, to individuals . . . not receiving aid or assistance under any plan of the State . . . .

\* \* \* \* \* \*

but whose income and resources are insufficient to meet all of such cost—
(1) inpatient hospital services . . . ;
(2)(A) outpatient hospital services . . ;
(3) *other laboratory and X-ray services;*
(4)(A) skilled nursing facility services . . for individuals 21 years of age or older (B) effective July 1, 1969, such early and periodic screening and diagnosis of individuals who are eligible under the plan and are under the age of 21 to ascertain their physical or mental defects, and such health care, treatment, and other measures to correct or ameliorate defects and chronic conditions discovered thereby, as may be provided in regulations of the Secretary; and (C) family planning services and supplies furnished (directly or under arrangements with others) to individuals of child-bearing age (including minors who can be considered to be sexually active) who are eligible under the State plan and who desire such services and supplies;
(5) physicians' services furnished by a physician . . . whether furnished in the office, the patient's home, a hospital, or a skilled nursing facility, or elsewhere;
(6) medical care, or any other type of remedial care recognized under State law, furnished by licensed practitioners within the

are: inpatient hospital services, outpatient hospital services, other laboratory and X-ray services, skilled nursing facility services and physicians' services. 42 U.S.C. § 1396a(a)(13)(B).[6] In addition to mandatorily providing those five types of services to the categorically needy, a participating state has the option of expanding its program to include reimbursement to those who demonstrate a need for medical assistance and who meet the categorical requirements of Title XIX but whose incomes are too high to allow them to qualify for the categorical assistance programs (the "medically needy"). 42 U.S.C. § 1396a(a)(10)(C). If a state opts to include the medically needy in its Medicaid program, it must provide the medically needy with at least the level of services it provides to the categorically needy, as described in clauses (1) through (5) of § 1396d, or it must provide to the medically needy the types of services listed in any seven of the clauses numbered (1) through (16) of § 1396d. 42 U.S.C. § 1396a(a)(13)(C)(i), (ii). Pennsylvania has chosen to provide medical assistance to both

the categorically needy and the medically needy and to provide the medically needy with all of the services that Title XIX requires a state to provide to the categorically needy, i. e., inpatient hospital services, outpatient hospital services, other laboratory and X-ray services, skilled nursing facility services and physicians' services. 62 P.S. § 443.1, et seq.; Stipulation ¶ 26.

Title XIX does not specify the exact types of services within the broad categories enumerated in § 1396d which must be made available by a state to the categorically needy or to the medically needy. In fact, nowhere does Title XIX list a specific medical service, treatment or procedure. Title XIX does, however, provide that the medical assistance made available to either a categorically needy or medically needy person shall not be less in amount, duration or scope than the medical assistance made available to any other person in that particular category. 42 U.S.C. §§ 1396a(a)(10)(B)(i), (ii) and (C)(ii). Title XIX also requires that a participating state

scope of their practice as defined by State law;
(7) home health care services;
(8) private duty nursing services;
(9) clinic services;
(10) dental services;
(11) physical therapy and related services;
(12) prescribed drugs, dentures, and prosthetic devices; and eyeglasses prescribed by a physician skilled in diseases of the eye or by an optometrist, whichever the individual may select;
(13) other diagnostic, screening, preventive, and rehabilitative services;
(14) inpatient hospital services, skilled nursing facility services, and intermediate care facility services for individuals 65 years of age or over in an institution for tuberculosis or mental diseases;
(15) intermediate care facility services . . . ;
(16) effective January 1, 1973, inpatient psychiatric hospital services for individuals under age 21 . . . ; and
(17) any other medical care, and any other type of remedial care recognized under State law, specified by the Secretary . . . .

6. 42 U.S.C. § 1396a(a)(13) states, in pertinent part, that a state plan for medical assistance must:

provide—

(A)(i) for the inclusion of some institutional and some noninstitutional care and services, and
(ii) for the inclusion of home health services for any individual who, under the State plan, is entitled to skilled nursing facility services, and
(B) in the case of individuals receiving aid or assistance under any plan of the State approved under subchapter I, X, XIV, or XVI, or part A of subchapter IV of this chapter, or with respect to whom supplemental security income benefits are being paid under subchapter XVI of this chapter, for the inclusion of at least the care and services listed in clauses (1) through (5) of section 1396d(a) of this title, and
(C) in the case of individuals not included under subparagraph (B) for the inclusion of at least—
(i) the care and services listed in clauses (1) through (5) of section 1396d(a) of this title or
(ii)(I) the care and services listed in any 7 of the clauses numbered (1) through (16) of such section and (II) in the event the care and services provided under the State plan include hospital or skilled nursing facility services, physicians' services to an individual in a hospital or skilled nursing facility during any period he is receiving hospital services from such hospital or skilled nursing facility services from such facility . . . .

include reasonable standards in its program for determining eligibility for, and the extent of, the medical services to be provided under the plan which, *inter alia*, are consistent with the objectives of the subchapter. 42 U.S.C. § 1396a(a)(17).[7]

Title XIX's implementing regulations basically reiterate this statutory scheme and clarify the obligations which a participating state must meet in providing services to the categorically and medically needy persons found eligible to participate in its Medicaid programs. 42 C.F.R. § 446.151, *et seq.* The implementing regulations, like Title XIX, do not specify the type or extent of medical treatment or procedures which a state must provide. The regulations do, however, require that a participating state must specify the amount and/or duration of each item of medical care that will be provided and that such items must be sufficient in amount, duration and scope to reasonably achieve their purpose. 42 C.F.R. § 449.10(a)(5)(i).[8] This regulation further states that a state may not arbitrarily deny or reduce the amount, duration or scope of medical assist-

ance solely because of the diagnosis, type of illness or condition. *Id.* The regulations also reiterate the requirements of § 1396d that at least the first five of the sixteen delineated types of service must be made available to the categorically needy, and the first five, or seven of the sixteen, delineated services be made available to the medically needy. 42 C.F.R. § 449.10(a)(1) and (2)(i), (ii).

In support of their request for final injunctive and declaratory relief, the plaintiffs argue that Public Acts 16A and 148 violate their rights under Title XIX of the Social Security Act, as well as their constitutional rights under the First, Fourth, Ninth and Fourteenth Amendments to the United States Constitution. With respect to their argument based upon Title XIX of the Social Security Act, the plaintiffs argue, first, that the Social Security Act requires that state Medicaid programs provide funds for physician and hospital services incidental to medically necessary abortions. In support of this argument, the plaintiffs argue that 42 U.S.C.

---

**7.** 42 U.S.C. § 1396a(a)(17) states, in pertinent part, that a state plan for medical assistance must:

include reasonable standards (which shall be comparable for all groups and may, in accordance with standards prescribed by the Secretary, differ with respect to income levels . . .) for determining eligibility for and the extent of medical assistance under the plan which (A) are consistent with the objectives of this subchapter, (B) provide for taking into account only such income and resources as are, as determined in accordance with standards prescribed by the Secretary, available to the applicant or recipient and (in the case of any applicant or recipient who would, except for income and resources, be eligible for aid or assistance in the form of money payments under any plan of the State approved under subchapter I, X, XIV, or XVI, or part A of subchapter IV, or to have paid with respect to him supplemental security income benefits under subchapter XVI of this chapter as would not be disregarded (or set aside for future needs) in determining his eligibility for such aid, assistance, or benefits, (C) provide for reasonable evaluation of any such income or resources, and (D) do not take into account the financial responsibility of any individual for any applicant or recipient of assistance under the plan unless such applicant or recipient is such individual's spouse or such individual's child who

is under age 21 or . . . is blind or permanently and totally disabled, or is blind or disabled as defined in section 1382c of this title . . . and provide for flexibility in the application of such standards with respect to income by taking into account, except to the extent prescribed by the Secretary, the costs . . . incurred for medical care or for any other type of remedial care recognized under State law . . . .

**8.** 42 C.F.R. § 449.10(a)(5)(i) states that a participating state must:

Specify the amount and/or duration of each item of medical and remedial care and services that will be provided to the categorically needy and to the medically needy, if the plan includes this latter group. Such items must be sufficient in amount, duration and scope to reasonably achieve their purpose. With respect to the required services for the categorically needy (paragraph (a)(1) of this section) and the medically needy (paragraph (a)(2) of this section), the State may not arbitrarily deny or reduce the amount, duration, or scope of, such services to an otherwise eligible individual solely because of the diagnosis, type of illness or condition. Appropriate limits may be placed on services based on such criteria as medical necessity or those contained in utilization or medical review procedures.

§§ 1396a(a)(13)(C) and 1396d require that a qualifying state plan must reimburse certain medical services to those who are eligible for welfare under the federal categorical assistance program and, if the state so chooses, under the federal medical assistance program which services necessarily involve most, if not all, of the standard procedures incidental to abortions. They argue, further, that *White v. Beal,* 413 F.Supp. 1141 (E.D.Pa.1976), *aff'd,* 555 F.2d 1146 (3d Cir. 1977), requires that, in addition to the types of services which a state Medicaid plan must cover, a prerequisite for state participation is that all "medically necessary" treatment be reimbursed and that a denial of reimbursement for "medically necessary" services is a violation of the minimum requirements of Title XIX. Whether or not an abortion is "necessary," they argue, must be determined by the Supreme Court's standard in *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), that:

> [W]hether . . . "an abortion is necessary" is a professional judgment that . . . may be exercised in light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient. All of these factors may relate to health. This allows the attending physician the room he needs to make his best medical judgment.

*Id.,* at 192, 93 S.Ct. at 747. Secondly, the plaintiffs argue that Title XIX's requirements that the services made available "shall not be less in amount, duration, or scope than the medical assistance made available to any other such [recipient] . . ."

contained in 42 U.S.C. § 1396a(a)(10)[9] means that states must have at least a rational basis for differentiating between the medical services available to different groups of the needy. They argue, further, that Title XIX's prohibitions of exclusions from Medicaid based solely upon the diagnosis, type of illness or condition are violated by Public Acts 16A and 148, which provide reimbursement for abortions necessary to save the life of the mother but which would exclude from reimbursement those abortions certified by a physician as being medically necessary and, thus, would exclude from Medicaid coverage a large portion of the necessary medical services relating to abortion.

Finally, the plaintiffs argue that the "Hyde Amendment"[10] does not alter the mandates of Title XIX but only operates to withhold federal-matching funds from the federal-state cooperative program. Alternatively, they argue that, if this Court finds that the Hyde Amendment does modify Medicaid program coverage requirements, the Hyde Amendment provides federal funding for a broader class of medically necessary abortions than either Public Act 16A or Public Act 148.

In response to plaintiffs' request for permanent injunctive and declaratory relief, Colautti requests this Court to direct the Secretary of the United States Department of Health, Education and Welfare ("HEW") to submit to the Court his views on the issues before the Court. Casey, in response to plaintiffs' request for permanent injunctive and declaratory relief, argues, *inter alia,*[11] that the doctor-class and the individ-

---

**9.** *See* note 4, *supra.*

**10.** The Hyde Amendment, P.L. 94–439, § 209 (1976), and P.L. 95–205, § 101 (1977), states, in pertinent part:

> [N]one of the funds provided for in this paragraph shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest have been reported promptly to a law enforcement agency or public health service; or except in those in-

stances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians.

**11.** The Court notes that Casey's argument with respect to this Court's jurisdiction to entertain this action and his request that this Court abstain from deciding the issues before it, both of which are based upon the issue of the constitutionality of Public Act 16A's inclusion of substantive language in an appropriations bill, have been rendered moot by the passage of Public Act 148.

ual not-for-profit Pennsylvania organizations lack standing in the instant case; the former because they have no legal right to practice medicine in accordance with their best medical judgment and also because they are not members of the class of women whose rights they seek to represent, and the latter because they have not demonstrated an injury in fact. Next, Casey, citing *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), argues that, to be entitled to injunctive and declaratory relief, the plaintiffs must demonstrate that the restrictive funding provisions of Public Acts 16A and 148 are unreasonable in order to overcome Pennsylvania's strong and important state interest as expressed by its legislature. Finally, Casey argues that Title XIX does not require the funding of abortions, because the Act contains no mention of abortions and because 42 U.S.C. §§ 1396a(a)(13)(B) and 1396d(a)(1)–(5) do no more than outline general areas of medical treatment without requiring that participating states fund every procedure that falls within the five categories. Rather, Casey argues, 42 U.S.C. § 1396a(a)(17), by requiring only that a state plan for medical assistance must include "reasonable standards," clearly allows states great latitude in choosing both the procedures they wish to fund and the extent to which they wish to fund them.

Finally, the Court has been presented with a brief by several *amici curiae* in opposition to the plaintiffs' request for relief. The *amici* argue, *inter alia*, first, that the purpose of Title XIX is not to guarantee the citizens of the states the right to medical treatment for particular items, but rather ". . . to *enable* each state as far as practicable under the conditions in each state, to furnish . . . medical assistance." 42 U.S.C. § 1396 [12] (emphasis added by *amici*). In support of this argument, *amici* argue that the Hyde Amendment expresses Congress' view that neither the federal government nor the states need fund particular items of medical assistance and, further, that by its passage of the Hyde

Amendment, Congress is *preventing* rather than *enabling* the states from providing medical assistance for this procedure. *Amici* further argue that the purpose of requiring detailed state plans, as expressed in the final sentence of § 1396, is merely to ensure that the federal government is not put in a position of having to reimburse services it does not wish to reimburse. Under this interpretation of § 1396, *amici* argue that the language of § 1396a(a)(13), requiring that a state plan for medical assistance must provide for services in designated categories, means only that, if the state is to receive reimbursement for those services, it must comply with the requirements of the statute in regard to them, and not that if a state is to receive reimbursement for services provided in any of the categories it must provide them in all categories.

Second, *amici* argue that, on its face, the statute and its implementing regulations permit the states to specify to what degree abortions will be funded as an exercise of state discretion in setting reasonable standards. In support of this argument, *amici* argue that: (1) § 1396's reference to "necessary medical services" is the only reference to "medical necessity" in the entire Act; (2) the significance of the clause "medically necessary services" in § 1396 is merely to state that one of the purposes of Medicaid is to provide "medical assistance" to people who cannot afford "necessary medical services," *i. e.*, the clause refers to the standards for eligibility to receive Medicaid and not to the nature or extent of "medical assistance" mandated; and, (3) the phrase "enabling each State, as far as practicable" in § 1396, therefore, means that a state is not required to provide all "necessary medical services" but only to provide medical services which the states deem to be "practicable." Moreover, relying upon *Beal v. Doe*, 432 U.S. 438, 444, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977), *amici* argue that nothing in Title XIX requires the states to fund every medical procedure that falls within the delineated categories of medical services in § 1396a(a)(13). Rather, they argue,

12. *See* note 3, *supra*.

§ 1396a(a)(17), as interpreted by the Supreme Court in *Beal v. Doe, supra,* requires only that a state plan for medical assistance must adopt reasonable standards for determining the extent of medical assistance which will be provided under the plan which are consistent with the objectives of Title XIX and that, other than the limiting standards that the extent of medical assistance be reasonable and consistent with the objectives of the Act, a state has a great deal of discretion to determine the types of medical assistance that will be made available.

Furthermore, *amici* argue that Title XIX's implementing regulation, 42 C.F.R. § 449.10(a)(5)(i): (1) permits broad state discretion in specifying the extent of medical assistance which the state will provide; (2) permits the states to choose items which will or will not be provided; (3) cites "medical necessity" as only one of the criteria which a state may apply in establishing "appropriate limits" on the types of services it will provide; (4) gives to the state rather than to physicians the right to make judgments about the degree of medical necessity in any given procedure; and, (5) permits a state to decide not to fund abortions other than those necessary to save the life of the mother, where the state's decision is based on an important and legitimate interest in protecting the potentiality of human life. In support of this last argument, *amici* argue that such a decision is neither arbitrary nor in any way based upon the diagnosis, type of illness or condition involved, that Pennsylvania's program covers the condition of pregnancy and any illnesses associated with pregnancy, and that its exclusion merely refers to one alternative response to, or treatment of, some complications resulting from pregnancy. *Amici* then argue that 42 U.S.C. § 1396a(a)(19)[13] and its implementing regulation do not mean, as plaintiffs argue, that the state plan's mandate to furnish services in a manner "consistent with . . . the best interests of the recipients" must provide certain medical services, but only that the medical services provided must relate to the manner in which medical assistance is provided.

Third, *amici* argue that the historical context in which Title XIX was enacted clearly demonstrates that neither Congress nor the states intended that states be required to fund medical practices or procedures which are opposed to valid state interests, such as Pennsylvania's interest in the protection of fetal life. In support of this argument, *amici* rely in essence upon the argument that abortions were not legal, except under certain limited circumstances, in the majority of states at the time of Title XIX's enactment, that Congress could not have intended states to provide funds for illegal services and that the intent of the enacting Congress must prevail in future times. Finally, *amici* argue that Pennsylvania has a strong, legitimate, rational interest in the life of the fetus and that it is inconceivable that Title XIX requires the states to fund procedures diametrically opposed to a state's strong interests.

 First, with respect to the issue of the standing of the four different types of plaintiffs to assert their federal statutory claims on their own behalf and on behalf of others, it is well settled that a party has standing to assert a claim if that party has alleged that the challenged action has caused or will cause him injury in fact, economic or otherwise, *i. e.,* that the party has such a personal stake in the outcome of the controversy that it is insured that the dispute sought to be adjudicated will be presented in an adversary context and in a form capable of judicial resolution, and if that party is a proper proponent of the particular legal rights they assert. *Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Roe v. Wade,* 410 U.S. 113, 123–125, 93 S.Ct. 705, 35

---

13. 42 U.S.C. § 1396a(a)(19) provides, in pertinent part, that a state plan for medical assistance must:

provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided in a manner consistent with simplicity of administration and the best interests of the recipients . . . . .

L.Ed.2d 147 (1973); *Data Processing Service v. Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). With respect to the standing of the named women plaintiffs and the women-class, Casey concedes, and we hold, that the named women plaintiffs, on their own behalf and on behalf of the women-class, and the women-class have standing to assert their federal statutory claims in this action. *Roe v. Wade, supra*, 410 U.S. at 124–125, 93 S.Ct. 705. Second, we hold that plaintiff doctors Franklin and Gerstley have standing to assert their federal statutory claims on their own behalf and on behalf of the doctor-class. In the complaint, Franklin and Gerstley allege that they are licensed obstetrician-gynecologists who perform and who desire to continue performing, medically necessary abortions for women eligible for medical assistance and that their best medical judgment will be impaired if their clients are unable to obtain medically necessary services because of the state's refusal to reimburse them for such services. These allegations of injury in fact and of a classically adverse relationship between the parties are sufficient to support the standing of the physician plaintiffs to assert their statutory claims on their own behalf. *Singleton v. Wulff, supra*, 428 U.S. at 109–110, 113, 96 S.Ct. 2868. We find, further, that the plaintiff physicians have standing to assert the claims of the doctor-class. *Id.*, at 114–115, 96 S.Ct. 2868. However, because the named women plaintiffs and the women-class appear to be adequate representatives of their own interests, we do not decide whether the physicians have standing to assert claims on behalf of the women-class. *Id.*, at 115–116, 96 S.Ct. 2868.

■ Third, we hold that the health care providers have standing to assert their federal statutory claims on their own behalf. In the complaint, the stipulation of facts and the affidavits submitted to the Court, the health care providers allege, *inter alia*, that they are Pennsylvania charitable or not-for-profit corporations which provide medically necessary abortions for patients eligible to receive medical assistance and that they will not be able to continue to provide, and will refuse to provide, these services unless they receive reimbursement from the state or the woman herself can provide funds to cover the cost of the procedure. In addition, Women's Health and Elizabeth Blackwell have submitted affidavits which allege that their respective organizations will suffer an economic injury in fact from the loss of Medicaid reimbursements. These allegations are clearly sufficient to support the standing of the health care providers to assert their federal statutory claims on their own behalf. *Warth v. Seldin*, 422 U.S. 490, 498–499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Planned Parenthood of Minnesota v. Citizens for Community Action*, 558 F.2d 861, 865 n.3 (8th Cir. 1977). However, as with the plaintiff physicians, we do not decide whether the health care providers have standing to assert these claims on behalf of the women-class, because those claims are adequately represented by the women plaintiffs and the women-class. *Singleton v. Wulff, supra*, 428 U.S. at 115–116, 96 S.Ct. 2868. Finally, we hold that plaintiff Welfare Rights has standing to assert the federal statutory claims of its members. Welfare Rights alleges in the complaint that it consists of, and is directed by, medical and public assistance recipients, including those for whom abortions have been or potentially will be certified as being medically necessary and who are threatened with a denial of reimbursement for such services by Public Acts 16A and 148. It is well settled that an organization whose members are injured in fact has standing to represent the interests of its members. *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 97 S.Ct. 2434, 2441–2442, 53 L.Ed.2d 383 (1977); *Warth v. Seldin, supra*, 422 U.S. at 511, 515, 95 S.Ct. 2197.

Turning to the merits of the plaintiffs' statutory claims under Title XIX of the Social Security Act, we hold that Title XIX requires participating states to provide all medically necessary services, including medically necessary abortions, to eligible participants of the program, and that Pub-

lic Acts 16A and 148, by limiting Medicaid reimbursement to those abortions necessary to save the life of the mother, arbitrarily discriminate against medically necessary abortions on the basis of the diagnosis, type of illness or condition involved, in violation of the objective and requirements of Title XIX and its implementing regulations.

The stated objective of Title XIX is to provide medical assistance for those persons unable to afford necessary medical services. 42 U.S.C. § 1396. While it is true that Title XIX nowhere explicitly states that "all necessary medical services" must be provided to eligible participants of a participating state's program, the plain meaning of its objective of providing assistance to those unable to afford "necessary" medical services must be construed as meaning that the medical assistance provided by the program must be sufficient to provide the "necessary" medical services which the eligible are otherwise unable to afford. Whether or not an abortion is a "necessary" medical service is a ". . . medical judgment [that] may be exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient. All these factors relate to health. This allows the attending physician the room he needs to make his best medical judgment. And it is room that operates for the benefit, not the disadvantage, of the pregnant woman." *Doe v. Bolton, supra*, 410 U.S. at 192, 93 S.Ct. at 747; *see also, Beal v. Doe, supra,* 432 U.S. at 441, n.3, 97 S.Ct. at 2369.

A state which chooses to participate in Medicaid must comply with the requirements of Title XIX and its implementing regulations to be eligible for federal reimbursement. Those requirements require participating states to provide the categorically needy with certain medical services, including inpatient hospital services, outpatient hospital services, other laboratory and X-ray services and physicians' services. 42 U.S.C. §§ 1396a(a)(13)(B), 1396d(a)(1)–(5); 42 C.F.R. § 449.10(a)(1). A participating state, if it opts to also provide medical assistance to the medically needy, must provide the medically needy with certain medi-

cal services, 42 U.S.C. §§ 1396a(a)(13)(C), 1396d(a)(1)–(16); 42 C.F.R. § 449.10(a)(2), which in the case of Pennsylvania are identical to those provided to the categorically needy. Stipulation ¶ 26. We take judicial notice of the fact that standard abortion procedures necessarily involve most, if not all, of these types or classes of services.

As the Supreme Court stated in *Beal v. Doe, supra*:

> Although Title XIX does not require states to provide funding for all medical treatment falling within the five general categories, it does require that State medicaid plans establish "reasonable standards . . . for determining . . . the extent of medical assistance under the plan which . . . are consistent with the objectives of [Title XIX]." 42 U.S.C. § 1396a(a)(17). (1970 ed., Supp. V).

*Id.*, at 441, 97 S.Ct. at 2369. The Supreme Court further stated:

> This language confers broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be "reasonable" and "consistent with the objectives" of the Act.

*Id.*, at 444, 97 S.Ct. at 2371 (footnote omitted). The objective of the Act, as found above, is to provide necessary medical services for all those unable to afford them. While a state need not provide funding for all medical treatment falling within the five mandatory categories of services and may adopt reasonable standards to determine the extent of medical services that it will provide, it may not employ that discretion to eliminate entirely from reimbursement those medical services certified by a qualified physician as being medically necessary. 42 U.S.C. § 1396a(a)(17) states that a state must:

> include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan which (A) are consistent with the objectives of this subchapter, (B) provide for taking into account only such income

and resources as are . . . available to the applicant or recipient . . . (C) provide for reasonable evaluation of any such income or resources, and (D) do not take into account the financial responsibility of any individual for any applicant or recipient of assistance under the plan . . . .

We do not construe this language, as *amici* argue, as enabling the states to adopt standards relating to the extent of medical services provided which eliminate certain necessary medical services entirely if the public interest disapproves of those medical services. Rather, we construe this language as pertaining primarily to permitting the states to adopt discretionary, but liberal, standards for determining the standards for, and degree of, financial eligibility under Medicaid, as well as the standards for determining the scope of non-medically necessary services that it will provide to eligible participants. *See Beal v. Doe, supra*, 432 U.S. at 444–445, 97 S.Ct. at 2371. This construction is reinforced by Title XIX's implementing regulations, 42 C.F.R. § 449.-10, *et seq.*, which require a state to, *inter alia*, "specify the *amount* and/or *duration* of each item of medical and remedial care and services that will be provided. . ." 42 C.F.R. § 449.10(a)(5)(i) (emphasis supplied). These regulations expressly require that "such items must be sufficient in amount, duration and scope to reasonably achieve their purpose." *Id.* The regulations then go on to prohibit a state from arbitrarily denying or reducing the amount, duration or scope of such services "solely because of the diagnosis, type of illness or condition." *Id.* We find that the clear meaning of this portion of the regulations implementing Title XIX require the states to provide at least the minimum necessary medical services required for the successful treatment of the particular medical condition presented. We find, further, that these implementing regulations, while permitting states to exclude or limit some unnecessary medical services if in its discretion it chooses to do so, flatly prohibit a state from excluding entirely or limiting below the minimum treatment required any

category or type of necessary medical services except for reasons either not relating to, or in addition to, the diagnosis, type of illness or condition. Further support for this finding is found in the final sentence of 42 C.F.R. § 449.10(a)(5)(i), which states:

Appropriate limits may be placed on services based on such criteria as medical necessity or those contained in utilization or medical review procedures.

We do not, as *amici* argue, construe the clause "such criteria as medical necessity" to mean that that criterion is but one of many criteria that may, but need not, be employed. Rather, we construe that clause as giving an example of the types of criteria that may permissibly be employed by a state in determining the extent of its Medicaid program, e. g., medical necessity. In other words, we construe this sentence as permitting a state to apply limits upon the medical procedures it supplies, such as non-medical necessity, *see, e. g., Beal v. Doe, supra*, but not as limiting the other requirements and objectives of Title XIX that all medically necessary services be reimbursed.

■ The argument of *amici* that, because it will treat pregnancy-related conditions, including complications, and that it will reimburse abortions which are necessary to save the life of the mother, it does not discriminate against non-lifesaving abortions *solely* on the basis of diagnosis, type of illness or condition, is not persuasive. On the contrary, we find such a limitation to arbitrarily discriminate against non-lifesaving abortions *solely* on the basis of diagnosis, type of illness or condition. The avowed reason for the exclusion is the moral repugnance of the legislature of the Commonwealth of Pennsylvania to abortions *per se*, except in cases where the abortion is necessary to save the life of the mother. This reason for the limitation does not rest upon reasons of non-medical necessity, reasonable alternative methods or other permissible criteria, but rather eliminates entirely such a necessary medical service solely because the condition is pregnancy and because the professional judgment of the attending physician is that the most

appropriate and medically necessary treatment that is in the best interest of the patients is an abortion. In fact, by the exclusion enumerated in Public Acts 16A and 148, a state may be prohibiting reimbursement for the *only* appropriate medically necessary treatment in a particular case.

Nor do we find the argument of *amici* that the will of the people, as voiced through its legislature, outweighs the rights of otherwise eligible participants of a participating state's Medicaid program to be reimbursed for a medical procedure certified by a physician as being necessary to her health. We recognize, of course, that the will of the people of a participating state is an important interest. *See Beal v. Doe, supra,* 432 U.S. at 446, 97 S.Ct. at 2372; *Roe v. Wade, supra,* 410 U.S. at 162, 93 S.Ct. 705. But we cannot find that that will outweighs the federal statutory rights of eligible women to receive reimbursement for medical services necessary to their health and well-being. We are buttressed in our decision by the great majority of cases which have found the statutory rights of Medicaid recipients to outweigh the states' interest in refusing to fund abortions other than those necessary to save the life of the mother. *See, e. g., Doe v. Kenley,* 584 F.2d 1362 (4th Cir. 1978); *Committee to Defend Reproductive Rights v. Myers,* No. 741710 (Super.Ct.Calif., August 10, 1978); *Emma G. v. Edwards,* 434 F.Supp. 1048 (E.D.La., 1977); *Preterm v. Dukakis,* 591 F.2d 121, Civ. No. 78–165C (1st Cir., August 9, 1978); *Right to Choose v. Byrne,* Civ. No. C–3817–77 (Sup.Ct.Middlesex Co., N.J., July 7, 1978) (preliminary injunction); *Smith v. Ginsberg,* Civ. No. 75–9380 CH (S.D.W.Va., May 9, 1978); *Zbaraz v. Quern,* 572 F.2d 582 (7th Cir. 1978). *But see D. R. v. Mitchell,* 456 F.Supp. 609 (D.Utah 1978). We are further buttressed by the Supreme Court's statement in *Beal v. Doe, supra,* that:

> Although serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage, it is hardly inconsistent with the objectives of the Act for a State to refuse to fund *unnecessary*

—though perhaps desirable—medical services.

*Id.,* at 444–445, 97 S.Ct. at 2371, and further that:

> As we acknowledged in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the State has a valid and important interest in encouraging childbirth. We expressly recognized in *Roe* the "important and legitimate interest [of the State] . . . in protecting the potentiality of human life." *Id.,* at 162, 93 S.Ct. [705], at 731. *That interest alone* does not, at least until approximately the third trimester, become sufficiently compelling to justify unduly burdensome state interference with the woman's constitutionally protected privacy interest. But it is a significant state interest existing throughout the course of the woman's pregnancy. Respondents point to nothing in either the language or the legislative history of Title XIX that suggests that it is unreasonable for a participating State to further this unquestionably strong and legitimate interest in encouraging normal childbirth. Absent such a showing, we will not presume that Congress intended to condition a State's participation in the Medicaid program on its willingness to undercut this important interest by subsidizing the costs of *nontherapeutic* abortions.

*Id.,* at 445–446, 97 S.Ct. at 2371–2372 (footnote omitted) (emphasis supplied).

Finally, we find the Hyde Amendment to support the position of the plaintiffs. The Hyde Amendment is but a congressional affirmance of the Supreme Court's decision in *Beal v. Doe, supra,* that states need not provide funding for nontherapeutic services, including nontherapeutic abortions. The very language of the Hyde Amendment supports this conclusion, for it provides funding "in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians."

Accordingly, for the reasons stated above, we will grant the plaintiffs' motion for permanent injunctive and declaratory relief and we will permanently enjoin Casey and Colautti from enforcing Public Act 16A or Public Act 148 by refusing to administer or to release state funds appropriated for medical assistance to reimburse otherwise eligible women, physicians or health care providers for medically necessary abortions.

An appropriate Order will be entered.