614 F.2d 601
 Jane E. HODGSON, M. D.; Midwest Health Center for Women,
Inc.; Paula Poe; Sandra Lackey; and all others
similarly situated, Appellees,
v.
BOARD OF COUNTY COMMISSIONERS, COUNTY OF HENNEPIN; John E.
Derus, Chairman; Jeff Spartz; Thomas E. Ticen; Richard E.
Kremer; E. F. Robb, Jr.; Sam S. Sivanich; Nancy Olkon;
Robert Randle, Director, Medical Assistance Program,
Department of Public Health; Thomas Jolicoeur, Supervisor,
Medical Advisory Unit; Edward J. Dirkswager, Jr.,
Commissioner, Department of Public Welfare; Department of
Public Welfare of the State of Minnesota, Appellants.
Carolyn COE, Individually and on behalf of all others
similarly situated and Mark Tanz, M. D.,
Individually and on behalf of all others
similarly situated, Appellees,
v.
Edward J. DIRKSWAGER, Jr., Individually and in his capacity
as Commissioner, Minnesota Department of Public Welfare and
State of Minnesota, Department of Public Welfare; Howard
Kelly, Individually and in his capacity as Division
Director, Hennepin County Department of Economic Assistance,
Adult Medical Division, Individually and on behalf of all
other Directors of County Department of Economic Assistance,
Adult Medical Division for all other counties in the State
of Minnesota, Appellants.
 No. 79-1665.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 8, 1979.
Decided Jan. 9, 1980.
Rehearing Denied Feb. 8, 1980.
 
 William P. Marshall, Sp. Asst. Atty. Gen., St. Paul, Minn., for appellants; Warren R. Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., St. Paul, Minn., Thomas L. Johnson, Hennepin County Atty., and Charles F. Sweetland, Asst. County Atty., Minneapolis, Minn., on the brief.
 Lynn I. Miller, Washington, D. C., for appellees; Roy Lucas, Washington, D. C., Marc G. Kurzman, Kurzman & Manahan, Maynard E. Pirsig, Gary B. Crawford, Midwest Health Center for Women, Sidney S. Feinberg, Minneapolis, Minn., on the brief.
 Before ROSS and STEPHENSON, Circuit Judges, and McMANUS,* Chief Judge.
 STEPHENSON, Circuit Judge.
 
 
 1
 At issue is the validity of a Minnesota welfare statute, Minn.Stat.Ann. § 256B.02, subd. 8(13) (West Supp.1978), which provides medical payment reimbursements for only those abortions necessary to prevent the pregnant woman's death or to terminate pregnancy resulting from rape or incest.[1] On plaintiffs' motion for summary judgment the district court[2] held that this restriction conflicted with the requirements of the Medicaid Act, Title XIX of the Social Security Act of 1965, 42 U.S.C. §§ 1396-1396i. The court further held that these requirements were not affected by the Hyde Amendment, Pub.L. No. 95-480, § 210, 92 Stat. 1567 (1978), an amendment to an appropriations act which forbids federal financing of abortion except where necessary to prevent death, preserve long-term physical health, or provide necessary medical procedures in cases of rape or incest.[3] We affirm the district court's ruling that Title XIX, as originally enacted, conflicts with and thus supersedes Minnesota's statutory restriction on abortion financing. We also hold, however, that the Hyde Amendment has altered Title XIX's requirements, with the result that, as a statutory matter, Minnesota need only finance those abortions contemplated by the Hyde Amendment. We therefore reverse and remand.[4]I. Background
 
 
 2
 Minnesota provides medical assistance for the financially needy. Persons meeting economic eligibility requirements may receive partial or total reimbursement for the cost of certain specified medical services. Minn.Stat.Ann. § 256B.02, subd. 8 (West Supp.1978). These services include "(a)bortion services, but only if one of the following conditions is met * * *." Id. subd. 8(13). The first condition is that, in the opinion of two physicians, "the abortion is medically necessary to prevent the death of the mother." Id. subd. 8(13)(a). The other two conditions involve pregnancy due to rape and pregnancy due to incest. Id. subd. 8(13)(b), (c). Thus, Minnesota will reimburse indigents for the expenses of life-sustaining abortions but not for the expenses of abortions that are only health-sustaining.[5]
 
 
 3
 Plaintiffs in these consolidated cases[6] are patients, physicians, and medical clinics.[7] They point to several health-threatening conditions which are complicated or created by pregnancy but which are not life-threatening and which are, therefore, outside the scope of Minn.Stat.Ann. § 256B.02, subd. 8(13) (West Supp.1978). These conditions include chronic lung disease, essential hypertension, diabetes, kidney disease, heart disease, sickle cell anemia, pulmonary emboli, depression, hepatitus, fetal deformity, phlebitis, abnormal conditions diagnosed by amniocentesis, and obesity.
 
 II. The Effect of Title XIX
 
 4
 Title XIX is a federal aid program that allows participating states, through the use of federal funds, to furnish medical assistance.[8] A state need not participate in the plan, but must, if it does participate, meet certain requirements. See 42 U.S.C. § 1396a(a)(1)-(40). Any state plan must provide for furnishing medical assistance to the "categorically needy." See 42 U.S.C. §§ 1396a(a)(13)(B), 1396d(a)(1)-(5). These are people who receive financial aid from certain specified federal aid programs. See 42 C.F.R. § 435.100-.135, .700-.740 (1978). A state may also choose, as Minnesota has, to provide medical assistance to the "medically needy." See 42 U.S.C. § 1396a(a)(10)(C). These are people who do not qualify for some forms of federal assistance but who nonetheless lack the resources to obtain adequate medical care. See 42 C.F.R. § 435.300-.325, .800-.845 (1978). Here too, however, the state must meet certain requirements.
 
 
 5
 First, the participating state must subsidize, for the medically needy, either the seven services it must subsidize for the categorically needy, see 42 U.S.C. § 1396d(a)(1)-(5), or at least seven of the sixteen services listed in 42 U.S.C. § 1396d(a). See 42 U.S.C. § 1396a(a)(13)(C). In satisfying this requirement, Minnesota subsidizes in-patient hospital services, physicians' services, out-patient hospital or clinic services, and "(a)ny other medical or remedial care licensed and recognized under state law." Minn.Stat.Ann. § 256B.02, subd. 8(1), (3), (4), (16) (West Supp.1978). We think it plain that these services include medical procedures to induce abortions. The provision of none of these services is subject to the condition that the recipient's life be in danger. That condition is imposed, by subd. 8(13) (with exceptions for pregnancies caused by rape or incest), only for the medical procedure of abortion.
 
 
 6
 Second, the state must "include reasonable standards * * * for determining eligibility for and the extent of medical assistance under the plan which * * * are consistent with the objectives of (Title XIX)." 42 U.S.C. § 1396a(a)(17). "Title XIX's broadly stated primary objective (is) to enable each State, as far as practicable, to furnish medical assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services." Beal v. Doe, 432 U.S. 438, 444, 97 S.Ct. 2366, 2371, 53 L.Ed.2d 464 (1977) (citing 42 U.S.C. §§ 1396, 1396a(a)(10)). A further objective is that policies governing eligibility be in the "best interests" of the recipient. 42 U.S.C. § 1396a(a)(19); 45 C.F.R. § 206.10(a)(11) (1978).[9]
 
 
 7
 Third, the statute stipulates that the medical assistance made available to a medically needy person be "equal in amount, duration, and scope" to that made available to all other medically needy persons in his or her particular category. 42 U.S.C. § 1396a(a)(10)(C)(ii). See Roe v. Casey, 464 F.Supp. 487, 494 (E.D.Pa.1978).
 
 
 8
 Finally, regulation 42 C.F.R. § 440.230 provides that:
 
 
 9
 (b) Each service must be sufficient in amount, duration, and scope to reasonably achieve its purpose.
 
 
 10
 (c)(1) The medicaid agency may not (arbitrarily) deny or reduce the amount, duration, or scope of a required service under §§ 440.210 (for the categorically needy) and 440.220 (for the medically needy) to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition.
 
 
 11
 (2) The agency may place appropriate limits on a service based on (such criteria as) medical necessity or on utilization control procedures.[10]
 
 
 12
 Plaintiffs argue that Minnesota must subsidize the medically necessary abortions of those women who otherwise qualify for medical assistance. This argument rests on two separate lines of statutory interpretation. The first is that Title XIX requires Minnesota to provide all "medically necessary" services, abortion services included. The second is that even if Minnesota need not subsidize all medically necessary services, it cannot provide services that would include abortion and other pregnancy-related services and then single out abortion services for a more restrictive standard. One or both of these lines of interpretation have been cited by judicial opinions favoring the view that Title XIX requires participating states to subsidize medically necessary abortions. See, e. g., Zbaraz v. Quern, 596 F.2d 196 (7th Cir. 1979), petition for cert. filed, 48 U.S.L.W. 3013 (U.S. July 24, 1979) (No. 79-64); Preterm, Inc. v. Dukakis, 591 F.2d 121 (1st Cir.), cert. denied, 441 U.S. 952, 99 S.Ct. 2182, 60 L.Ed.2d 1057 (1979); Doe v. Busbee, 471 F.Supp. 1326 (N.D.Ga.1979); Planned Parenthood Affiliates of Ohio v. Rhodes, 477 F.Supp. 529 (S.D.Ohio 1979); Freiman v. Walsh, No. 77-4161CV-C (W.D.Mo. Jan. 26, 1979), aff'd sub nom. in relevant part, Reproductive Health Services v. Freeman, 614 F.2d 585 (8th Cir. 1980); Roe v. Casey, 464 F.Supp. 487 (E.D.Pa.1978); Emma G. v. Edwards, No. 77-1342 (E.D.La. Nov. 27, 1978); Smith v. Ginsberg, No. 75-0380 CH (S.D.W.Va. May 9, 1978); Right to Choose v. Byrne, 165 N.J.Super. 443, 398 A.2d 587 (1979). Apparently only one case has held to the contrary. D. R. v. Mitchell, 456 F.Supp. 609 (D.Utah 1978) (state medicaid statute subsidizing only life-sustaining abortions not inconsistent with requirements of Title XIX).
 
 
 13
 The district court stated that it concluded on the basis of the reasoning set forth in Preterm, Inc. v. Dukakis, supra, that the Minnesota statute and its implementing regulations are inconsistent with Title XIX and 42 C.F.R. § 440.230 (1978).[11] The court specifically held that the Minnesota abortion subsidy restriction is inconsistent with the objectives of Title XIX and impermissibly denies medical assistance on the basis of diagnosis, type of illness, or condition.
 
 
 14
 We affirm on essentially the same grounds. Once a state designates services it will subsidize, it may distinguish between eligible and ineligible recipients only on the basis of their degree of medical need. 42 U.S.C. §§ 1396, 1396a(a)(10)(C)(i), (ii), 1396a(a)(17), 1396a(a)(19); 42 C.F.R. §§ 206.10(a)(11), 440.230(b)(c)(1), (2) (1978). It may be that a state may reasonably exclude some procedures on the basis that they are never, or generally never, of sufficient medical necessity. See Preterm, Inc. v. Dukakis, supra, 591 F.2d at 125; Virginia Hospital Ass'n v. Kenley, 427 F.Supp. 781, 785 (E.D.Va.1977) (state may lawfully limit subsidy of in-patient hospital services to twenty-one days, even though some recipients would require more than twenty-one days of hospitalization). But see White v. Beal, 555 F.2d 1146, 1150-52 (3d Cir. 1977) (Title XIX permits discrimination in benefits based on degree of medical necessity but not on type of medical disorder; state may not choose to provide eyeglass subsidies for only those persons whose poor vision is from eye disease, even though state considers them most needy); Pinneke v. Preisser, No. C77-3023 (N.D.Iowa May 11, 1979) (determination of medical necessity, at least for those services mandated for the categorically needy, must be based on need of particular individual, not type of operation; state may not deny subsidy for sex change operation where physician deems it medically necessary). But it remains that the basic criterion is the financially eligible recipient's degree of medical need. The infirmity of the Minnesota scheme is that it subsidizes health-sustaining services generally, including pregnancy-related services, but subsidizes abortions only if they are life-sustaining.[12] This policy denies service solely on the basis of diagnosis[13] or condition,[14] and does so arbitrarily because the denial is not in accordance with a uniform standard of medical need.[15]
 
 
 15
 Defendants advance a series of arguments to the effect that Minnesota may permissibly limit reimbursement for abortion expenses to pregnancies that either threaten life or result from rape or incest. Summarized, they are: (1) that no state obligation under Title XIX should be inferred absent specific language, and there is no specific language in Title XIX that requires abortion subsidies; (2) that Minnesota need not subsidize abortions based on medical need because its obligation is to subsidize services only "as far as practicable in the conditions (of the) State," 42 U.S.C. § 1396; (3) that 42 U.S.C. § 1396a(a)(17), which mandates reasonable standards for determining "the extent of medical assistance," pertains solely to financial eligibility requirements, and not to scope of required services; and (4) that 42 C.F.R. § 440.230 (1978) permits a state to deny health-sustaining abortion services in order to further the state's interest in encouraging childbirth, as recognized in Beal v. Doe, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977). We will examine these contentions in sequence.
 
 
 16
 First, we acknowledge that Title XIX does not expressly require a state to subsidize abortions. But neither does Title XIX require that any specific medical procedure be subsidized. Yet it is clear that subsidies for some procedures are required, whether they be all medically necessary procedures within the categories of services that a state has authorized, see, e. g., Roe v. Casey, supra, 464 F.Supp. at 500, or all medically necessary procedures that a state has specifically authorized, see, e. g., Preterm, Inc. v. Dukakis, supra, 591 F.2d at 125.
 
 
 17
 Second, we agree that Minnesota must subsidize services, at least within certain limits, only so far as practicable. Beyond question, Minnesota need not subsidize services not medically necessary. Beal v. Doe, supra. And possibly Minnesota might, in order to conserve the public fisc, determine the scope of the services it provides even within the category of "medically necessary" services. It remains, however, that the scope must be determined in accordance with the objectives of Title XIX providing medical assistance in accordance with the eligible recipient's best interests and on an even-handed basis. Minnesota cannot eliminate one health-sustaining service entirely while leaving others intact. See Roe v. Casey, supra, 464 F.Supp. at 501.
 
 
 18
 Third, we reject the contention that section 1396a(a)(17) pertains solely to financial eligibility requirements and not to the scope of services. Section 1396a(a)(17) stipulates that a state "include reasonable standards * * * for determining eligibility for and the extent of medical assistance under the plan." Defendants argue that "medical assistance" refers only to the amount of state contribution toward the cost of the service in question, and that the section leaves the state free to determine the particular medical procedure it will provide for under Title XIX. One trouble with this argument is that the Supreme Court has already decided to the contrary.
 
 
 19
 (N)othing in the statute suggests that participating States are required to fund every medical procedure that falls within the delineated categories of medical care. Indeed, * * * (section 1396a(a)(17)) confers broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be "reasonable" and "consistent with the objectives" of the Act.
 
 
 20
 Beal v. Doe, supra, 432 U.S. at 444, 97 S.Ct. at 2370-2371. Thus, the Court read section 1396a(a)(17) to limit state discretion with respect not only to eligibility for services but to the scope of services. "Extent of medical service," then, refers both to the amount of subsidy for any given service and to the extent of services provided. See id. at 444 n.8, 97 S.Ct. 2366 n.8; Roe v. Casey, supra, 464 F.Supp. at 500-01. Any doubt on the matter is removed by 42 C.F.R. § 440.230 (1978), which subjects to a reasonableness requirement not only the "amount" and "duration" but also the "scope" of service. See Roe v. Casey, supra, 464 F.Supp. at 501.
 
 
 21
 Finally, we are not persuaded that Minnesota may refuse to subsidize health-sustaining abortions in order to promote its interest in encouraging childbirth.[16] The purpose of Title XIX is, as we have stated, to provide medical benefits to those in greatest need. The state may further interests in economy and administrative efficiency by reasonably modifying its eligibility requirements, and even perhaps its scope of medically necessary services, see Preterm, Inc. v. Dukakis, supra, 591 F.2d at 125, but where medically necessary services are concerned, Title XIX contemplates restrictions only in conformance with degree of medical need. See 42 C.F.R. § 440.230(C)(2) (1978).
 
 
 22
 Beal v. Doe, supra, is not to the contrary. In Beal, the Supreme Court considered whether Pennsylvania's medicaid plan, which subsidized only "medically necessary" abortions, was consistent with Title XIX.[17] The Court held generally that Title XIX permits a state "to refuse to fund unnecessary though perhaps desirable medical services." 432 U.S. at 445, 97 S.Ct. at 2371. This statement alone would have justified Pennsylvania's refusal to subsidize medically unnecessary abortions as part of a refusal to subsidize medically unnecessary procedures generally. But the Court went further, presumably because Pennsylvania had chosen to subsidize some medically unnecessary procedures while discriminating against medically unnecessary abortions.[18] The Court held that exclusion of medically unnecessary abortions under a state's medicaid plan was valid under section 1396a(a)(17). The exclusion was reasonable because it furthered the state's legitimate interest in "protecting the potentiality of human life." Id. at 446, 97 S.Ct. at 2371. The exclusion was also consistent with Title XIX's objective of providing assistance in accordance with medical need because, by definition, there was no medical need involved. The Beal Court declined to consider whether a state could refuse to subsidize services that were medically necessary. Id. at 444, 97 S.Ct. at 2370. Thus, the Court held only that a state can reasonably refuse to subsidize certain medical procedures where to do so is not inconsistent with Title XIX's objectives.
 
 
 23
 This holding does not save the Minnesota statute. Minnesota's refusal to subsidize medically necessary abortions may or may not be "reasonable" under Beal. It is clear, however, that Minnesota's abortion subsidy restriction is inconsistent with Title XIX's objectives in that it denies medical assistance on the basis of the type of medical disorder and not on the degree of medical need. Our conclusion is in harmony with Beal.
 
 
 24
 We therefore hold that Minnesota's welfare scheme, which subsidizes medical assistance services generally but which subjects abortions to a "life-threatening" standard, is inconsistent with and superseded by Title XIX. Abortions, like other medical services, must be subsidized on the basis of the recipient's financial and medical need.
 
 III. The Effect of the Hyde Amendment
 
 25
 The Hyde Amendment is the name given to language inserted in Health, Education and Welfare appropriations acts for fiscal years 1977, 1978, and 1979. The version before the district court read:
 
 
 26
 None of the funds provided for in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest has been reported promptly to a law enforcement agency or public health service; or except in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians.
 
 
 27
 Pub.L. No. 95-480, § 210, 92 Stat. 1567, 1586 (Oct. 18, 1978).[19]
 
 
 28
 Defendants contend that the Hyde Amendment substantively amends Title XIX and thus removes any obligation a participating state may have to subsidize abortions beyond those contemplated by the Amendment. Plaintiffs respond that the Amendment limits only federal spending. Courts have split on the question. The only two courts of appeals that have considered the question have supported defendants' position. Zbaraz v. Quern, supra, 596 F.2d at 199-202; Preterm, Inc. v. Dukakis, supra, 591 F.2d at 127-34. Plaintiffs' position, however, is supported by the dissent of Judge Bownes in Preterm, and by the opinions of several district courts. E. g., Planned Parenthood Affiliates of Ohio v. Rhodes, supra, 477 F.Supp. at 537-39; Doe v. Busbee, supra, 471 F.Supp. at 1331-34; Doe v. Mathews, 422 F.Supp. 141, 143 (D.D.C.1976) (dictum); Doe v. Mathews, 420 F.Supp. 865, 869 (D.N.J.1976) (dictum). Contra, e. g., Freiman v. Walsh, supra, slip op. at 7 (Hyde Amendment automatically suspends state's Title XIX subsidy obligations), aff'd sub nom. in relevant part on different rationale, Reproductive Health Services v. Freeman, 614 F.2d 585 (8th Cir. 1980) (see note 1 supra ); McRae v. Mathews, 421 F.Supp. 533, 538 (E.D.N.Y.1976) (Hyde Amendment manifestly calculated to terminate public financing of abortions), vacated & remanded on other grounds, 433 U.S. 916, 97 S.Ct. 2993, 53 L.Ed.2d 1103 (1977).
 
 
 29
 The district court, after ruling that Minnesota's abortion assistance plan was inconsistent with its obligations under Title XIX, relied on the reasoning of the Preterm dissent, the district court in Roe v. Casey, supra, and the Department of Health, Education and Welfare (HEW) in ruling that the Hyde Amendment merely restricts federal spending and has no impact on a state's obligations under Title XIX. We disagree with this interpretation.
 
 
 30
 We adopt the conclusion of the majority in Preterm : the Hyde Amendment was
 
 
 31
 a substantive policy decision concerning the public funding of abortions which left the states free to fund more abortions than those for which federal funds were made available by the Amendment, but did not require them to do so. (Title XIX,) to the extent of its repugnancy with the Hyde Amendment, has therefore been altered by the Amendment.
 
 
 32
 591 F.2d at 134. The gist of the arguments that plaintiffs make here was considered and persuasively rejected by the First and Seventh Circuits in Preterm and Zbaraz, respectively. We will state our corresponding views in abbreviated form, therefore, and specifically address plaintiffs' arguments only insofar as they seem novel or otherwise deserving of attention in light of Preterm and Zbaraz.
 
 
 33
 By its terms, the Hyde Amendment applies directly only to the appropriation of federal funds. It appears to amend the state's obligations under Title XIX, if at all, only by implication.[20] Application of an enactment's literal meaning is justified when the result is not absurd or "plainly at variance with the policy of the legislation as a whole." United States v. American Trucking Ass'ns, Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1939). But application of the Hyde Amendment's literal meaning would prevent the federal government from reimbursing states for abortion expenses that states would be required to assume under Title XIX. This result would be out of harmony with Title XIX's basic policy, which is to "enable" states to furnish medical assistance by providing reimbursements from the federal "sums appropriated therefor." 42 U.S.C. §§ 1396, 1396b. See Zbaraz v. Quern, supra, 596 F.2d at 200; Preterm, Inc. v. Dukakis, supra, 591 F.2d at 127-28. Plaintiffs contend that their literal reading of the Hyde Amendment is ultimately consistent with Title XIX's cost-sharing policy inasmuch as a requirement that states subsidize non-Hyde Amendment abortions would thereby free funds that would otherwise be needed to subsidize childbirth expenses. We agree that reading the Hyde Amendment literally would not potentially cripple the state's medical assistance program, for the reasons plaintiffs indicate. Contra, Preterm, Inc. v. Dukakis, supra, 591 F.2d at 130-31. It remains, however, that plaintiffs would have Title XIX, in light of the Hyde Amendment, implicitly require a state to assume the full cost of a medical procedure, contrary to settled congressional practice. There have been departures from the practice statutory provisions that require state expenditures unmatched by federal funds but "when Congress has imposed such conditions, it has done so explicitly and for the apparent purpose of encouraging the states to undertake programs Congress deemed to be desirable." Zbaraz v. Quern, supra, 596 F.2d at 200 n.12.
 
 
 34
 We therefore think it appropriate to look beyond the literal wording of the Amendment to its purpose, which its legislative history makes evident. Because the Amendment was introduced on the floor of the House and Senate, there are no committee reports, only floor debates. The history of the debates is exhaustively analyzed in other opinions on the subject, see Zbaraz v. Quern, supra, 596 F.2d at 199-202; Preterm, Inc. v. Dukakis, supra, 591 F.2d at 127-38; Planned Parenthood Affiliates of Ohio v. Rhodes, supra, 477 F.Supp. at 538-39; Doe v. Busbee, supra, 471 F.Supp. at 1332-34, and we will not recite it in detail here.[21]
 
 
 35
 The analyses of the floor debates contained in the First and Seventh Circuit opinions strongly support the inference that those who voted for the Hyde Amendment wanted to discourage public financing of abortions in all but the three instances the Amendment specified. Numerous congressmen and senators commented throughout the Amendment's six-month debate to the effect that the Amendment would have a substantive impact. Zbaraz v. Quern, supra, 596 F.2d at 200; Preterm, Inc. v. Dukakis, supra, 591 F.2d at 128-31. The opponents of the bill, particularly, left no mistake that they perceived the Hyde Amendment to remove any requirement that states subsidize non-Hyde Amendment abortions. Senator Packwood, for instance, admonished:
 
 
 36
 Let us be very clear about it. If we do not fund abortions, these 250,000 to 300,000 women who now receive abortions, paid for by Federal or State moneys under medicaid, are either going to have babies they do not want or are going to go to backroom abortionists. There is no question that the poor are going to be discriminated against.
 
 
 37
 123 Cong.Rec. S11,031 (1977), quoted in Preterm, Inc. v. Dukakis, supra, 591 F.2d at 130.
 
 
 38
 Plaintiffs argue that Preterm erred in relying on opponents' statements concerning the Amendment's effect. Accord, Planned Parenthood Affiliates of Ohio v. Rhodes, supra, 477 F.Supp. at 539. Reliance on the opponents' description of a proposed bill's meaning can rarely be dispositive, of course, for "(i)n their zeal to defeat a bill, (the opponents) understandably tend to overstate its reach." NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760, 377 U.S. 58, 66, 84 S.Ct. 1063, 1068, 12 L.Ed.2d 129 (1964). Like every other aid to statutory interpretation, however, the opponents' interpretation of a proposed bill later enacted is a factor to consider. Moreover, here the opponents' adverse description reinforces the sponsor's evident intent. "It is the sponsors that we look to when the meaning of the statutory words is in doubt." Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394-95, 71 S.Ct. 745, 750-751, 95 L.Ed. 1035 (Jackson, J., concurring). In the first month of the June-December debate, Congressman Hyde stated:
 
 
 39
 Yesterday, remarks were made that it is unfortunate to burden an appropriation bill with complex issues, such as busing, abortion and the like. I certainly agree that it is very unfortunate. The problem is that there is no other vehicle that reaches this floor in which these complex issues can be involved. Constitutional amendments which prohibit abortions stay languishing in subcommittee, much less committee, and so the only vehicle where the Members may work their will, unfortunately, is an appropriation bill. I regret that. I certainly would like to prevent, if I could legally, anybody having an abortion, a rich woman, a middle-class woman, or a poor woman. Unfortunately, the only vehicle available is the HEW medicaid bill. A life is a life. The life of a little ghetto kid is just as important as the life of a rich person. And so we proceed in this bill.
 
 
 40
 123 Cong.Rec. H6083 (1977), quoted in Zbaraz v. Quern, supra, 596 F.2d at 201 n.14. With both opponents and proponents, Congressman Hyde as well as several others, in agreement that the Hyde Amendment would have substantive effect, we believe that Congress as a whole was aware of its intended impact.
 
 
 41
 Plaintiffs also rely on statements in the debates to the effect that only federal spending was involved.[22] The Zbaraz court reasoned that these statements are best interpreted as reminders that the Amendment was merely discouraging abortions through a refusal to subsidize them rather than prohibiting them through regulation. The distinction, then, was between spending and regulation, not between federal spending and state spending. The Preterm court found no inconsistency between these statements and its view that Congress withheld federal funds as a means to effect a substantive amendment. These conclusions are sound. Moreover, we think it fanciful to suggest that the members of Congress who voted for the Hyde Amendment viewed the removal of federal financing for non-Hyde Amendment abortions as an end in itself, rather than as a means to the end of terminating all required public financing of these abortions. The common sense of the matter is that the supporters of the Amendment wanted to induce a general halt to the public financing of abortions, and not to shift, with no apparent rational motivation, a large part of the cost of abortion-financing from the federal government to the states. Once all the rules of statutory construction have been stated and applied, it remains the judicial function to give legislation its intended effect. To interpret the Hyde Amendment as anything but in effect a substantive amendment of Title XIX is to make it a futility, and this we decline to do.
 
 
 42
 We recognize that "(t)he doctrine disfavoring repeals by implication * * * applies with even greater force when the claimed repeal rests solely upon an Appropriations Act." TVA v. Hill, 437 U.S. 153, 190, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978). The First and Seventh Circuits have explained why this general rule, strongly implicated in the Hill case, has no application where the Hyde Amendment is concerned. Zbaraz v. Quern, supra, 596 F.2d at 201-02; Preterm, Inc. v. Dukakis, supra, 591 F.2d at 131-34. In Hill, the Supreme Court invoked the rule that implied repealers in appropriations acts are especially disfavored in deciding that continuing appropriations for construction of the Tellico Dam did not impliedly amend the Endangered Species Act, which otherwise would have prevented completion of the dam in order to save a designated endangered species, the snail darter. The facts in Hill indicated that the appropriations committees understood that appropriations for the Tellico Dam overrode the Endangered Species Act to the extent there was a conflict. Congress as a whole, however, was unaware of the appropriations act's possible implications. First, the appropriations act itself did not specify the projects for which it was authorizing funds. Second, the act that was arguably amended the Endangered Species Act was entirely separate in nature from the appropriations act which authorized the budget of the Tennessee Valley Authority. Finally, no substantive amendment was indicated because there was no indication that the appropriations act was in derogation of the House and Senate rules that declare out of order any appropriations act provision that changes existing law. TVA v. Hill, supra, 437 U.S. at 189-93, 98 S.Ct. 2279.
 
 
 43
 Here, by marked contrast, there is ample evidence of general congressional awareness of the Hyde Amendment's substantive significance. First, the Amendment was before Congress for six months, during which time there were twenty-five roll calls in the House and Senate. We have already emphasized the on-going commentary by members of Congress during the floor debates. Second, the Amendment expressly limits federal spending for particular purposes in an appropriations act for the agency which administers, in Medicaid, a program that is based on the federal financing initiative. Finally, the sponsors of the Amendment were openly using a method of substantive amendment disfavored by House and Senate rules. See, e. g., Zbaraz v. Quern, supra, 596 F.2d at 201 n.14 (remarks of Congressman Hyde in Congressional Record). Even read literally, the Hyde Amendment is in derogation of these rules, inasmuch as it literally alters the federal government's obligation to reimburse states under Title XIX. The Hyde Amendment was not, therefore, like the alleged implied repeal by an appropriations act that the Supreme Court refused to recognize as a substantive amendment in Hill ; it was an avowed attempt to alter public policy with respect to abortion financing.
 
 
 44
 In light of the above, we conclude that the general presumption against implied amendments gains no strength in this case from the mere fact that the amendment in question appears in an appropriations act. We remain of the view that the presumption is rebutted by strong evidence of congressional intent to change the substantive impact of Title XIX through removal of federal financing.
 
 
 45
 Plaintiffs raise two remaining arguments to the Preterm-Zbaraz reasoning we follow here. First, plaintiffs argue we should defer to the interpretation of HEW, as the agency assigned to administer the Hyde Amendment. Plaintiffs, and the district court, have assumed that HEW has taken the position that the Hyde Amendment does not suspend a state's Title XIX obligations.
 
 
 46
 We see no firm indication that HEW has ruled on the precise question before us: Whether the Hyde Amendment alters a state's Title XIX obligation to subsidize medically necessary abortions. HEW has indicated its view that the question whether federal funding is available for a particular medical procedure is separate from the question whether a state has an obligation under Title XIX to subsidize it. See, e. g., 43 Fed.Reg. 31,875 (1978). Thus, according to HEW, removal of federal funding does not automatically terminate a corresponding Title XIX obligation. Whatever the merit of this position, it does not contradict our view that the Hyde Amendment was intended to be not merely a removal of federal funding but a substantive amendment of Title XIX.
 
 
 47
 In any event, we note that the issue here involves interpretation of a statute, not an HEW regulation, and that the principle of according weight to agency interpretation is inapplicable where, as here, there are compelling indications toward the contrary view. New York Department of Social Services v. Dublino, 413 U.S. 405, 421, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973); Townsend v. Swank, 404 U.S. 282, 286, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971).
 
 
 48
 Finally, we acknowledge, as plaintiffs assert, that our statutory interpretation raises the serious constitutional question whether a state subsidizing only Hyde Amendment abortions under its medicaid program is acting in violation of the Equal Protection Clause, and that we should avoid constitutional questions where statutory construction makes this "fairly possible." Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932). Like the First and Seventh Circuits in Preterm and Zbaraz, however, we do not think that this doctrine compels us to accept a narrow interpretation of the Hyde Amendment that contradicts clear evidence of congressional intent.
 
 
 49
 We therefore hold that Minn.Stat.Ann. § 256B.02, subd. 8(13)(a) (West Supp.1978) is unenforceable because inconsistent with Title XIX, but that Minnesota's Title XIX obligation to subsidize abortions is modified by the Hyde Amendment. We thus reverse the district court and remand for proceedings consistent with this opinion.
 
 
 50
 Reverse and remand.
 
 
 51
 McMANUS, District Judge, dissenting.
 
 
 52
 I respectfully dissent. I would affirm Judge Alsop's opinion of July 17, 1979.
 
 
 53
 I agree with the majority, as it agrees with Judge Alsop, that the Minnesota statute and regulations as written are substantively inconsistent with Title XIX (Medicaid) as enacted. Where I differ with the majority is in their holding today that the Hyde Amendment (Hyde) substantively amends Medicaid. In so differing, I further agree with Judge Alsop that neither the constitutionality of the state law nor Hyde need be reached.
 
 
 54
 My reasons for concluding that Hyde does not substantively amend Medicaid mirror those of Judge Bownes, dissenting in Preterm, Inc. v. Dukakis, 591 F.2d 121, 134-38 (1st Cir. 1979). See also Planned Parenthood Affiliates v. Rhodes, 477 F.Supp. 529, 537-39 (S.D.Ohio 1979) (Kinneary, J., presiding); Doe v. Busbee, 471 F.Supp. 1326, 1331-34 (N.D.Ga.1979) (Murphy, J., presiding) ("For a court to say that the plain words of a statute mean something other than what they ordinarily mean because members of Congress have said they should, or would, have such an effect is for a court to abdicate its responsibility under our federal system." Id. at 1334 & n.21).
 
 
 55
 The cardinal rule is that repeals by implication are not favored. Morton v. Mancari, 417 U.S. 535, 549, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). Accord TVA v. Hill, 437 U.S. 153, 189, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The doctrine applies with full vigor when the subsequent legislation is an appropriation measure. TVA v. Hill, supra, 437 U.S. at 190, 98 S.Ct. 2279; Committee for Nuclear Responsibility v. Seaborg, 149 U.S.App.D.C. 380, 383, 463 F.2d 783, 785 (D.C. Cir. 1971). Given the limited duration of appropriations bills, the courts are properly reluctant to hold that such measures affect the substance of existing, on-going legislative programs. I do not find Congress' supposed intent to amend or repeal Medicaid to be "clear and manifest". Compare TVA v. Hill, supra, 437 U.S. at 189, 98 S.Ct. 2279.
 
 
 56
 Hyde was a rider to an appropriations bill. It is, and has been, subject to yearly change. The fiscal year 1977 version differed radically from those enacted for 1978, 1979 and 1980. The very fact that Congress has adopted four different Hyde Amendments in four years would seem obviously to belie any intention on its part to substantively amend Medicaid once and for all. And given the current political winds emanating from the abortion storm one can easily envision future design changes. An expansive construction of Hyde would not only undermine the on-going stability of Medicaid but would also embroil this and other courts in reviewing such claimed amendments, year after year. The thought of so doing is unnerving if not repugnant.
 
 
 57
 If Congress intends that neither the federal nor state governments fund medically necessary abortions as Medicaid on its face requires, it knows full well how to make its intent clear and manifest by forthrightly amending Medicaid directly. To permit Congress to do less is tantamount to having courts legislate, by judicial interjection under the guise of construction, what Congress has been unable or unwilling to do by clear and manifest enactment.
 
 
 58
 It is not the judicial function to discern the public will; that is for the legislature. Rather the courts' function is to say what the law is and enforce it as it exists. See TVA v. Hill, supra, 437 U.S. at 194-95, 98 S.Ct. 2279. The fact that the issues presented in the therapeutic abortion funding context are of immense public import and controversy should not prod the courts into an ill-conceived, though perhaps understandable, abdication of their proper role in our tri-partite system of government. In my opinion, to conclude that Hyde substantively amends Medicaid amounts to nothing other than such an abdication. It is not only bad judicial practice, but also endorsement of bad legislative practice. It is bad law.
 
 
 59
 Finally, I am especially inclined to my view of the absence of legislative intent to amend or repeal Medicaid because Hyde was enacted by a simple majority of members of Congress in clear contravention of House and Senate rules that preclude amendment or implied repeal of substantive statutes by means of appropriations measures without a record of suspension of the rules in both Houses. See House Rule XXI(2); Standing Rule of the Senate 16.4. Compare Preterm, Inc. v. Dukakis, 591 F.2d at 138 (Bownes, J., dissenting). Cf. TVA v. Hill, 437 U.S. 153, 189-91, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).
 
 
 60
 In summary, I view Hyde as having no substantive effect on Medicaid. The Minnesota statutes and regulations as written are inconsistent with Medicaid as enacted and there is no need to reach the constitutional issues. I would affirm the trial court on all points.
 
 
 
 *
 The Honorable Edward J. McManus, Chief Judge, United States District Court for the Northern District of Iowa, sitting by designation
 
 
 [1]
 The Minnesota statute is similar to the Missouri statute we consider today in Reproductive Health Services v. Freeman, 614 F.2d 585 (8th Cir. 1980)
 
 
 [2]
 The Honorable Donald D. Alsop, United States District Judge for the District of Minnesota
 
 
 [3]
 The court enjoined Minnesota from enforcing its statutory restriction on abortion financing. On August 9, 1979, however, the court stayed its order, pending appeal, while still requiring Minnesota to process claims for reimbursement of expenses incurred for medically necessary abortions
 
 
 [4]
 Although we do not reach the constitutionality of the modified Minnesota statute, our decision today in Reproductive Health Services v. Freeman, 614 F.2d 585 (8th Cir. 1980), has obvious implications. In Freeman, we hold unconstitutional a state statutory scheme that would subsidize only those abortions contemplated by the Hyde Amendment
 
 
 [5]
 It follows, of course, that Minnesota generally does not reimburse expenses for abortions that are neither life-sustaining nor health-sustaining. This practice has withstood statutory and constitutional attack, Poelker v. Doe, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977); Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); Beal v. Doe, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977), and is not challenged here
 
 
 [6]
 The district court consolidated these cases for all purposes save the void for vagueness claim asserted in the Coe action
 
 
 [7]
 In the Hodgson case, the district court certified three classes: (1) Minnesota women generally eligible for medical assistance who have sought, are seeking, or will seek reimbursement for abortions performed for health reasons, but not to terminate pregnancies that threaten death or result from rape or incest; (2) physicians who regularly treat these patients; and (3) clinics and Medicaid providers who furnish facilities and services to these patients and physicians. The standing of these plaintiffs is not challenged. For discussion of the standing of similar plaintiffs, see Roe v. Casey, 464 F.Supp. 487, 498-99 (E.D.Pa.1978)
 
 
 [8]
 The purpose of Title XIX is to authorize federal spending "(f)or the purpose of enabling each State, as far as practicable under the conditions of such State, to furnish * * * medical assistance on behalf of (those persons) * * * whose income and resources are insufficient to meet the costs of necessary medical services * * *." 42 U.S.C. §§ 1396, 1396a(a)(10)(C)(ii)
 
 
 [9]
 The regulations we cite have been promulgated by the Department of Health, Education and Welfare. Their validity is unchallenged here and they must be presumed to have the "force and effect of law." See Chrysler Corp. v. Brown, 441 U.S. 281, 99 S.Ct. 1705, 1708, 60 L.Ed.2d 208 (1979)
 
 
 [10]
 The words "arbitrarily" and "such criteria as" appeared in the original regulation at 45 C.F.R. § 449.10(a)(5)(i) (1977), but do not appear in the redesignated regulation at 42 C.F.R. § 440.230 (1978). The Secretary of Health, Education and Welfare has explained that this omission was inadvertent, however, and has corrected the regulation to include these words. 43 Fed.Reg. 57,253 (1978) (corrected version to be codified in 42 C.F.R. § 440.230). We note that several courts have quoted the uncorrected version of section 440.230. E. g., Preterm, Inc. v. Dukakis, 591 F.2d 121, 126 (1st Cir. 1979). The addition of these words does not alter our view of the statute
 
 
 [11]
 The district court did not adopt the dictum in Preterm that a state can decide, in the first instance, which categories of services are medically necessary, and thus limit a physician's discretion in determining medical necessity, see 591 F.2d at 124-25. We need not and do not consider this aspect of the Preterm decision
 
 
 [12]
 A further infirmity in the Minnesota scheme, not necessary to our decision, is that it denies benefits for abortions that would remove threats to health while subsidizing, regardless of health considerations, abortions that would terminate pregnancies caused by rape or incest. "We find nothing in the federal statute that permits discrimination based on etiology rather than need for the service." White v. Beal, 555 F.2d 1146, 1151 (3d Cir. 1977)
 
 
 [13]
 A pregnancy diagnosed as life-threatening may be treated with a subsidized abortion. A pregnancy diagnosed only as health-threatening (and not caused by rape or incest) may not be treated with a subsidized abortion. No other treatment subsidy is subject to this life-threatening standard
 
 
 [14]
 Only for pregnancy-created or pregnancy-complicated conditions does Minnesota refuse to subsidize health-sustaining treatment
 
 
 [15]
 Assuming for the moment that Title XIX does not require subsidy of medically necessary services generally, Minnesota's diagnosis-based distinction for one form of pregnancy treatment might be valid if all subsidies of services were provided only to prevent death. Diagnosis and condition are acceptable criteria for denying service when based on degree of medical necessity, 42 C.F.R. § 440.230(C)(2) (1978). Because Minnesota does not adopt such a harsh standard generally, however, it may not adopt it for one specific treatment of one particular condition
 
 
 [16]
 Minnesota has not shown that refusing to subsidize health-sustaining abortions furthers any fiscal interest. In fact, figures prepared by the Minnesota Department of Health indicate that refusing to subsidize abortions is costly to the state. In fiscal year 1977 the average cost of a publicly-financed abortion was about $250 while the average cost of a publicly-financed childbirth was about $1100. What is more, the average cost of pregnancy-related medical assistance in the first year alone was about $1300. In light of these figures, Minnesota would save money by withholding abortion subsidies only if the vast majority of those women who were denied medicaid assistance then obtained abortions through private means. Minnesota Department of Health, Projected Effects of Eliminating Public Funding for Abortion 1, 3 (1978)
 Moreover, even a demonstrated fiscal interest would not justify eliminating abortion subsidies while leaving other subsidies in place. If the state is to save money in its medicaid program, it must reduce benefits even-handedly rather than singling out and eliminating the benefits relating to one type of medical disorder. See White v. Beal, 555 F.2d 1146, 1150 (3d Cir. 1977).
 
 
 [17]
 The Pennsylvania plan authorized subsidy for only those abortions that a physician certified as a medical necessity in light of the woman's age and her physical, emotional, psychological and familial conditions. Beal v. Doe, supra, 432 U.S. at 441-42 n.3, 97 S.Ct. 2366 n.3
 
 
 [18]
 "Pennsylvania has simply decided that there is a reasonable justification for excluding from Medicaid coverage a particular medically unnecessary procedure nontherapeutic abortions." Id. at 446-47 n.11, 97 S.Ct. at 2372 n.11
 
 
 [19]
 The appropriations bill for fiscal year 1980 maintains the general proscription of abortion subsidy and differs from its predecessors only in that it contains no exception for "severe and long-lasting physical health damage." Act of Nov. 20, 1979, Pub.L.No. 96-123, § 109
 
 
 [20]
 But see Freiman v. Walsh, supra. In Freiman, the district court, relying on 42 U.S.C. §§ 1396b(a), 1396d(b), reasoned that the Hyde Amendment automatically suspended a state's obligation to subsidize non-Hyde Amendment abortions because Title XIX "only binds the states to fund those medical procedures for which (they) will be reimbursed in accordance with the sharing formula set out in Title XIX." Id. at 7. We do not rely on this interpretation inasmuch as it is unnecessary to our result
 
 
 [21]
 The legislative debates that these opinions survey occurred prior to passage of the Hyde Amendment for the fiscal year 1978, Act of Dec. 9, 1977, Pub.L. No. 95-205, § 101, 91 Stat. 1460. Congress enacted identical language for fiscal year 1979, Act of Oct. 18, 1978, Pub.L. No. 95-480, § 210, 92 Stat. 1586, and substantially similar language for fiscal year 1980, see note 19 supra
 
 
 [22]
 For example, on the first day of debate in the House, Congressman Doran said (of the Amendment), "It simply denies Federal funds for the realization of a personal * * * decision * * *." 123 Cong.Rec. H6086 (June 17, 1977). Similarly, Congressman Edwards observed that "the only thing over which we have any control is what we do with Federal dollars." Id. at 6090
 Preterm, Inc. v. Dukakis, supra, 591 F.2d at 129.